# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v

ANDY JAMES BROWN,

     Defendant-Appellant.

UNPUBLISHED
May 10, 2016

No. 323887
St. Joseph Circuit Court
LC No. 13-018938-FC

Before: RIORDAN, P.J., and SAAD and MARKEY, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony, MCL 750.227b. Defendant appeals by right. We affirm.

Defendant was convicted of murdering David Locey. Locey owned Locey CPA, which was located at the intersection of M-66 and Wait Road in Sturgis, Michigan. Defendant was a shareholder in Locey CPA. In 2013, one of defendant's clients, VIP Auto Body, terminated defendant's services after it found evidence of embezzlement. On Monday, September 30, 2013, an attorney for VIP Auto Body spoke with Locey about the alleged embezzlement. On Tuesday, October 1, 2013, Locey met with defendant. Locey told defendant that he had not yet decided whether to terminate defendant's employment although he was leaning towards doing so. He had defendant's laptop computer brought to Ascend Computer so that it could be backed up to ensure that no files were deleted. On Wednesday, October 2, 2013, Locey left for work shortly after 7:00 a.m. He stopped at a Snappy Mart, and surveillance video showed him driving away from the gas station at 7:12 a.m. According to the ADT alarm panel at Locey CPA, Locey disarmed the alarm system at 7:13 a.m. Shortly before 8:00 a.m., Tammy Brunner, an employee of Locey CPA, found Locey dead in his office with a gunshot wound to his head.

## I. EXPERT TESTIMONY

Defendant argues that the trial court erred in admitting the gunshot residue evidence because the evidence, both of the gunshot residue particles and of the one-component and two-component particles, was not relevant and because the expert testimony was not reliable. Because defendant did not argue below that evidence of the gunshot residue particles was not

-1-

relevant, that argument is unpreserved. The other arguments, which were made to the trial court, are preserved. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review a trial court's evidentiary decisions, including its decisions regarding the admissibility of expert testimony, for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 217. Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

The admission of expert testimony is governed by MRE 702. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, a trial court has a gatekeeper function to ensure that any expert testimony admitted is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). *Edry*, 486 Mich at 639. The United States Supreme Court explained in *Daubert*, 509 US at 593-594, that many factors will bear on whether expert testimony is reliable, but it listed four specific factors that may be relevant: (1) whether a theory or technique has been or can be tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether the theory or technique has a known or potential rate of error, and (4) whether the theory or technique has been generally accepted by the relevant scientific community.

Stephanie Horner, who analyzed the items submitted to the RJ Lee Group, testified at the *Daubert* hearing that the use of scanning electron microscopes has been an accepted method to analyze gunshot residue in the scientific community since the 1970s, and the method has been subjected to peer review and publication. Horner also testified that based on the procedures that the RJ Lee Group uses which are taken from a publication of the Scientific Working Group on Gunshot Residue, the rate of error is zero. We disagree with defendant's argument that the expert testimony was not reliable because the software program that the RJ Lee Group created and uses in its scanning electron microscope has not been subjected to peer review. Peer review and publication of a theory or technique are not always necessary to meet the reliability requirement of MRE 702. See *Daubert*, 509 US at 593-594; *Elher v Misra*, 499 Mich 11, ___; ___ NW2d ___ (2015). Although Horner was unsure whether the software program the RJ Lee Group used has been subjected to peer review, she knew that the software program was modeled on the publication from the Scientific Working Group on Gunshot Residue and was approved by the American Society of Crime Laboratory Directors. Under these circumstances, the trial

court's decision that the expert testimony concerning the gunshot residue evidence was reliable fell within the range of reasonable and principled outcomes. *Unger*, 278 Mich App at 217.

Next, only relevant evidence is admissible. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Five particles of gunshot residue that were found on defendant's clothing were submitted to the RJ Lee Group. Defendant had either been wearing the clothing when he was arrested on October 2, 2013, or the clothing had been taken from the passenger's seat of his car. Horner testified at the *Daubert* hearing, as did Allison Murtha at trial, that there are three ways gunshot residue can get on an individual: (1) the individual discharged a firearm; (2) the individual was in the vicinity of a firearm when it was discharged, or (3) the individual came into contact with a surface that had gunshot residue on it. Because one of the ways that gunshot residue can be on an individual is that the individual discharged a firearm, evidence that gunshot residue particles were found on defendant's clothing made it more probable that defendant shot a gun and killed Locey. *Id.* Evidence of the gunshot residue particles was thus relevant.

Evidence of the one-component and two-component particles was also relevant. Horner testified at the *Daubert* hearing, as did Murtha at trial, that a particle cannot be classified as gunshot residue unless it contains lead, barium, and antimony. They also testified, however, that while one-component and two-component particles have sources other than from the discharge of a firearm, those particles can come from a firearm's discharge. Thus, the presence of one-component and two-component particles on clothing defendant wore and which was found in his car on October 2, 2013, on stubs dabbed on the driver's side door handle and on the turn signal lever of defendant's car had a tendency to make it more probable that defendant fired a gun on October 2, 2013, killing Locey. MRE 401.

We reject defendant's argument that evidence of the one-component and two-component particles should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. MRE 403. At trial, Murtha clearly and consistently testified that (1) a particle could only be classified as gunshot residue if it contained lead, barium, and antimony, and (2) one-component and two-component particles could come from the discharge of a firearm, but there are other sources from which those particles may have originated. She could not definitively say that the one-component and two-component particles came from the discharge of a firearm. Because of the clarity of Murtha's testimony, there was no danger that the probative value of the evidence of the one-component and two-component particles was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. MRE 403. The trial court did not abuse its discretion in denying defendant's request to preclude evidence of the one-component and two-component particles. *Unger*, 278 Mich App at 216.

Defendant also argues that the trial court erred in qualifying Detective Trooper Specialist Paul Gonyeau as an expert and allowing him to testify about the location of defendant's cellular telephone. The issue whether the trial court erred in qualifying Gonyeau as an expert is preserved because the trial court qualified Gonyeau as an expert following a hearing on the admissibility of his testimony, see MCR 2.517(7), and is reviewed for an abuse of discretion,

*Unger*, 278 Mich App at 216. Defendant's two remaining arguments regarding Gonyeau's testimony, i.e., that the underlying data was unreliable because the evidence did not establish that the data communications from defendant's cellular telephone used the closest cellular telephone tower and that Gonyeau's testimony was fraught with guesswork, are unpreserved. Although defendant objected to the admission of Gonyeau's testimony, these two arguments were not made before the trial court, see *Aldrich*, 246 Mich App at 133, so they are only reviewed for plain error, *Benton*, 294 Mich App at 202.

The admission of expert testimony requires the witness to be an expert. *Surman v Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007). The plain language of MRE 702 provides that a witness is qualified to testify as an expert based on "knowledge, skill, experience, training, or education." The trial court qualified Gonyeau as an expert in the use of technology to determine the locations of cellular telephones from information received from service providers. Defendant correctly states that before the present case, Gonyeau had never been qualified as an expert; Gonyeau testified that he had attended three trainings that addressed how to determine the location of a cellular telephone from information provided from a service provider. Since 2011, using his training, Gonyeau has created 75 to 100 maps. About half of the maps that Gonyeau created were used in cases where the police were attempting to find a cellular telephone in real time, and in most of those cases, the maps successfully allowed police officers to find the telephone. Based on this testimony, the trial court's decision to qualify Gonyeau as an expert in the use of technology to determination the locations of cellular telephones from information received from service providers did not fall outside the range of reasonable and principled outcomes. *Id*. at 305; *Unger*, 278 Mich App at 217.

In reaching this conclusion, we find no merit to defendant's claim that Gonyeau was not qualified as an expert because he did not understand how the information received from service providers was generated. A trial court must ensure that the data underlying the expert's theories is reliable. *Gilbert*, 470 Mich at 779. Expert testimony should be excluded when it is derived from unreliable and untrustworthy data. *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). That Gonyeau lacked knowledge of how the information he received from service providers is generated is relevant to the question whether the data underlying his testimony was reliable, not to the question whether he was qualified to be an expert in using technology to determine the locations of cellular telephones from information received from service providers.

We further reject defendant's argument that Gonyeau's expert testimony was unreliable because Gonyeau failed to establish that defendant's cellular telephone used the closest cellular telephone tower. The argument concerns the map showing the activity of defendant's cellular telephone, which consisted of data communications, from 7:05 to 7:20 a.m. on October 2, 2013. Defendant's argument is irrelevant. Gonyeau's testimony regarding the location of defendant's cellular telephone was based on the sectors of the cellular telephone towers that were used by the data communications. Whether the data communications used the closest cellular telephone tower to the telephone played no part in Gonyeau's testimony.

We also find no merit to defendant's claim that Gonyeau's testimony should not have been admitted because it was too inexact and fraught with guesswork. The basis for the argument is Gonyeau's testimony that he was only able to create "approximate" boundary lines for the sectors of the cellular telephone towers and that the area where he believed defendant's

cellular telephone was located between 7:05 and 7:09 a.m. on October 2, 2013, consisted of a range of miles. Defendant makes no successful argument that the techniques Gonyeau used from information he received about defendant's cellular telephone from Verizon were not reliable under MRE 702. Accordingly, defendant's argument concerns the weight of Gonyeau's testimony rather than its admissibility.

## II. OTHER-ACTS EVIDENCE

Defendant argues that the trial court erred in admitting evidence of the alleged embezzlement from VIP Auto Body and evidence of his 2004 conviction for embezzlement and the subsequent loss of his CPA license. Defendant has waived the argument that evidence of the alleged embezzlement from VIP Auto Body was improperly admitted. Although defense counsel objected to evidence of the alleged embezzlement from VIP Auto Body in his written response to the prosecutor's notice of intent under MRE 404(b), at the motion hearing, defense counsel specifically stated that he had no objection to the evidence of the alleged embezzlement from VIP Auto Body. "A defendant may not waive objection to an issue before the trial court and then raise the issue as an error on appeal." *Aldrich*, 246 Mich App at 111.

With respect to defendant's 2004 conviction and subsequent loss of his CPA license, we review a trial court's decision to admit other-acts evidence for an abuse of discretion. *People v McGhee*, 268 Mich App 600, 609; 709 NW2d 595 (2005). Three requirements must be met for other-acts evidence to be admissible. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). First, the evidence must be offered for a proper purpose, which is any purpose other than to show the defendant's action and conformity therewith. Second, the evidence must be relevant under MRE 402 to an issue of fact that is of consequence at trial. Third, under MRE 403, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009). Additionally, upon request, a trial court may provide a limiting instruction under MRE 105. *Knox*, 469 Mich at 509.

The prosecutor offered evidence of defendant's 2004 conviction of embezzlement for the purpose of establishing defendant's motive in killing Locey. Motive, which is the inducement for doing some act, is a proper purpose for other-acts evidence. MRE 404(b); *People v Sabin (After Remand)*, 463 Mich 43, 68; 614 NW2d 888 (2000). In addition, "[a]lthough motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant." *Unger*, 278 Mich App at 223.

Locey knew that an investigation was going to be conducted to determine whether defendant had embezzled from VIP Auto Body. At an October 1, 2013 meeting, Locey told defendant that he was leaning towards terminating defendant's employment. Defendant's wife left this meeting after calling defendant names such as liar, thief, and cheat. Then, following the October 1, 2013 meeting, Locey had Brunner bring defendant's laptop computer to Ascend Computer so that it could be backed up to ensure that no files were deleted. Evidence of defendant's 2004 conviction of embezzlement was relevant to defendant's motive. Having been previously convicted of embezzlement, defendant knew the consequences of an embezzlement conviction, including the loss of his CPA license. This knowledge had the tendency to make it more probable that defendant had an inducement, i.e., the desire to avoid those consequences, including a loss of his livelihood, to kill Locey, who had preserved evidence of the alleged

-5-

embezzlement and was contemplating terminating defendant's employment. MRE 401. We acknowledge that under this theory defendant had a motive to kill anyone with knowledge or evidence of the alleged embezzlement from VIP Auto Body, but evidence of motive does not become irrelevant simply because it shows that the defendant had the same motive to kill people other than the victim.

All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded under MRE 403. *McGhee*, 268 Mich App at 613-614. "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614. All evidence of defendant's guilt was circumstantial; there was no direct evidence of guilt. Thus, evidence of defendant's prior conviction, which was evidence of motive, was more than marginally probative. See *Unger*, 278 Mich App at 223. Additionally, the trial court took precautions to prevent the jury from giving the evidence of defendant's prior conviction undue or preemptive weight. It prohibited the prosecutor from going into the detailed facts about the prior conviction. It also gave a limiting instruction after the jury heard the evidence of defendant's 2004 conviction and during final instructions. See *People v Magyar*, 250 Mich App 408, 416; 648 NW2d 215 (2002) (referencing the trial court's limiting instruction in concluding that the other-acts evidence was not unfairly prejudicial). Under these circumstances, the trial court's decision that evidence of defendant's 2004 conviction and subsequent loss of his CPA license was not unfairly prejudicial fell within the range of reasonable and principled outcomes. *Unger*, 278 Mich App at 217. The trial court did not abuse its discretion in admitting evidence of defendant's 2004 conviction for embezzlement and the subsequent loss of his CPA license. *McGhee*, 268 Mich App at 609.

## III. EXTRANEOUS INFLUENCE

Defendant argues that he is entitled to a new trial because the jury foreperson, MF, introduced extraneous information during jury deliberations. A trial court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). We review a trial court's findings of fact for clear error. *Id*. "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. (citation omitted).

A defendant has a right to be tried by a fair and impartial jury. *Duncan v Louisiana*, 391 US 145, 153; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Consistent with this right, a jury may only consider the evidence that is presented in open court. *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). A jury's consideration of extraneous facts not introduced into evidence deprives a defendant of his constitutional rights of confrontation, cross-examination, and effective assistance of counsel. *Id*. To establish that an extraneous influence was error requiring reversal, a defendant must show: (1) the jury was exposed to an extraneous influence and (2) the extraneous influence created a real and substantial possibility that it could have affected the jury's verdict. *Id*. at 88-89. If the defendant proves these two points, then the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id*.

A firmly established common-law rule prohibits the admission of juror testimony to impeach a jury verdict. *People v Fletcher*, 260 Mich App 531, 539; 679 NW2d 127 (2004). The only recognized exception to this common-law rule relates to situations in which the jury verdict

-6-

was affected by an extraneous influence. *Id.* So, where there is evidence to suggest that the verdict was affected by an influence external to the trial proceedings, a court may consider juror testimony to impeach a verdict. *Id.* But where the alleged misconduct relates to influences internal to the trial proceedings, a trial court may not invade the sanctity of the deliberative process. *Id.* The distinction between an external influence and inherent misconduct is not based on the location of the wrong. *Budzyn*, 456 Mich at 91. "Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence." *Id.* In general, "information is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v Shauers*, ___ US ___; 135 S Ct 521; 529; 190 L Ed 2d 422 (2014). " 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id*.

Defendant argues that MF introduced the following extraneous information to the jury during deliberations: (1) she had a close and longtime personal relationship with Locey and his wife; (2) she served on a board with Locey' (3) she worked at the bank that Locey and his wife used; (4) Locey's wife had lost a lot of weight, and (5) she had a great deal of sympathy for the Locey family because of her relationship with them, and (6) defendant killed Locey because his wife, Heather Brown, was going to leave him. Initially, MF did not tell the jury that she had a close and longtime personal relationship with Locey and his wife. Both MK and BAS, two jurors, testified that MF made comments which indicated or caused them to think that MF had a personal relationship with Locey and his wife. Additionally, MF did not tell the jury that because of her relationship with the Locey family, she had a great deal of sympathy for them. MK was asked if MF said that she had a great deal of sympathy for the Locey family, but the trial court sustained an objection to the question, and MK did not answer it.

According to MK, MF told the jury that defendant killed Locey to save his marriage. Similarly, BAS testified that MF said that defendant killed Locey because Heather was going to leave him. The trial court found that these statements were not an extraneous influence because there was evidence to support MF's theory for why defendant killed Locey. At trial, Heather testified that in the early morning hours of October 1, 2013, defendant left the house because of an argument. Additionally, Joy Stevens, an employee of Locey CPA who attended the October 1, 2013 meeting, testified that Heather was agitated and angry at defendant at the meeting and called him names, such as liar, thief, embezzler, and cheat. According to Brunner, Heather was upset when she left the meeting and squealed the tires of her car as she left the parking lot. Based on this testimony, we are not left with a definite and firm conviction that the trial court made a mistake in finding that the evidence presented at trial supported a theory by a juror that defendant killed Locey because Heather was going to leave him. *Miller*, 482 Mich at 54. Accordingly, MF's statements that defendant killed Locey because Heather was going to leave him were not an extraneous influence. We note that there was no testimony from MK or BAS to indicate that MF's theory regarding defendant's motive was based on anything other than the evidence presented at trial.

There was testimony from MK and BAS that MF told the jury that she served on a board with Locey, that Locey's wife had lost a lot of weight, and that MF worked at the bank used by Locey and his wife. These statements were not an extraneous influence, as the statements did

not derive from a source external to the jury. See *Warger*, ___ US at ___; 135 S Ct at 529. The statements were based on MF's own personal experience and knowledge, not on anything she had read or heard about the case, and the statements did not provide her or the jury with any specific information or knowledge regarding Locey's murder. See *id.* at ___; 135 S Ct at 529.

Because defendant has not shown that MF introduced any extraneous information to the jury, the trial court did not abuse its discretion in denying defendant's motion for a new trial based on MF introducing an extraneous influence on the jury. *Miller*, 482 Mich at 544.

## IV. JUROR DISHONESTY

Defendant argues that he is entitled to a new trial because MF failed to disclose her bias against him during jury selection. A trial court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. *Miller*, 482 Mich at 544. We also review a trial court's evidentiary decisions for an abuse of discretion. Preliminary questions of law, such as whether a rule of evidence, constitutional provision, or statute precludes the admission of the evidence, are reviewed de novo. *People v Jones*, 270 Mich App 208, 211; 714 NW2d 362 (2006). Constitutional issues are reviewed de novo. *Steele*, 283 Mich App at 486.

A defendant has a right to be tried by a fair and impartial jury. *Duncan*, 391 US at 153. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). Defendant argues that he should have been allowed to prove his claim that MF hid her bias during jury selection with testimony from MK and BAS, as well as from MK, regarding MK's conduct and statements during jury deliberations. We disagree. MRE 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

The rules of evidence are interpreted pursuant to the principles of statutory construction. *People v Snyder (After Remand)*, 301 Mich App 99, 104; 835 NW2d 608 (2013). Thus, if the plain language of a rule of evidence is unambiguous, the Court "must enforce the meaning expressed, without further judicial construction or interpretation." *Id.* at 104-105 (quotation omitted).

MRE 606(b) is identical to FRE 606(b). In *Warger*, ___ US at ___; 135 S Ct at 525, the United States Supreme Court held FRE 606(b) precluded the plaintiff from using an affidavit from a juror regarding what another juror said during jury deliberations to prove that the other

juror was dishonest during jury selection. Noting that the language of FRE 606(b) was clear, the United States Supreme Court held that FRE 606(b) prohibits the use of any evidence of jury deliberations, subject only to the express exceptions for extraneous information, outside influences, and mistakes in entering the verdict on the verdict form. *Id.* at ___; 135 S Ct at 527, n 2. We find the reasoning in *Warger* persuasive and hold that the plain language of MRE 606(b) prohibits the use of any evidence of jury deliberations, subject to the three stated exceptions. Consequently, the trial court was precluded from hearing and considering the testimony of MK and BAS, as well as the testimony of MF, regarding MF's conduct and statements during deliberations for the purpose of determining whether MF was dishonest during jury selection.

Relying on footnote 3 in *Warger*, defendant argues that MRE 606(b) should not apply to the present case because MF'a bias was "so extreme" that his right to an impartial jury was violated. In footnote 3, the United States Supreme Court cautioned that "[t]here may be cases of juror bias so extreme that almost by definition, the jury trial right has been abridged. If and when such a case arises, the Court may consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." We disagree that this is such a case. Even if the testimony of MK, BAS, and MF regarding MF's conduct and statements during deliberations would show that MF's bias against defendant was "so extreme," defendant makes no argument that the "usual safeguards," see *Tanner v United States*, 483 US 107, 127; 107 S Ct 2739; 97 L Ed 2d 90 (1987), were insufficient to protect his right to an impartial jury. We note that MF's alleged bias resulted from a close relationship with Locey, but defense counsel had the opportunity to probe the extent of MF's relationship with Locey during jury selection.

Defendant also wanted to question MF about the truthfulness of her statement during jury selection that she had only read "a bit" about the case. According to defendant, it was likely that MF had read "a lot" about the case because her daughter-in-law reported on the case for the local newspaper and posted her stories on Facebook, to which MF had access. Even though testimony from MF regarding how much she had read about the case was not barred by MRE 606(b), as it did not concern "any matter or statement during the course of the jury's deliberations . . . ," the trial court did not err when it prohibited defendant from questioning MF regarding what she had read about the case before jury selection. Contrary to defendant's claim, MF did not state that she had read "a bit" about the case. Rather, she said that she had "read things" about it. Accordingly, even if MF had read articles about the case that her daughter-in-law posted to Facebook, this fact does not establish that MF was dishonest during jury selection.

Because defendant did not present any evidence that could be considered by the trial court and which showed that MF was dishonest during jury selection, the trial court did not abuse its discretion in denying defendant's motion for a new trial which was based on MF's failure to disclose her bias during jury selection. *Miller*, 482 Mich at 544.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that he is entitled to a new trial because he was denied the effective assistance of counsel. The determination whether a defendant was denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). A trial court must first find the facts and then decide

whether those facts constitute a violation of the defendant's right to effective assistance of counsel. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's findings of fact for clear error, but review de novo questions of constitutional law. *Id.*

To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that but for counsel's deficient performance there is a reasonable probability that the result of the proceedings would have been different. *Seals*, 285 Mich App at 17. A defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *LeBlanc*, 465 Mich at 578.

Defendant first claims that he was denied effective assistance of counsel because in the seven months between the preliminary examination and trial defense counsel failed to obtain an expert in fluid dynamics who could have testified to the time of Locey's death. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defense counsel testified that he knew that time of death was an important issue, so following the preliminary examination, he attempted to obtain an expert in fluid dynamics. He contacted two experts, but after numerous contacts or attempted contacts with both experts, defense counsel decided that he needed to keep looking for an expert. Until the eve of trial, his office continued to search for a fluid dynamics expert.[1] Under these circumstances, defense counsel's performance in failing to obtain an expert in fluid dynamics did not fall below objective standards of reasonableness. *Seals*, 285 Mich App at 17. Although defendant classifies defense counsel's efforts to obtain such an expert as "minimal," a defendant has the burden to prove the factual predicate for his claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). There are no facts on the record to support a conclusion that defense counsel's efforts in searching for an expert in fluid dynamics were minimal. Defense counsel was not ineffective for failing to obtain a fluid dynamics expert who could testify about the time of death.

Defendant also argues that defense counsel was ineffective for failing to present an expert in gunshot residue at the *Daubert* hearing or at trial. Decisions whether to call or question witnesses, including expert witnesses, are presumed to be matters of trial strategy. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003); *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Defense counsel testified that he sought an expert in gunshot residue. The second expert he consulted was Michael Trimpe. And, after reviewing Trimpe's credentials, defense counsel did not attempt to consult a third expert. Defense counsel had lengthy conversations with Trimpe, in which they discussed, in part, the procedures the RJ Lee Group used, the limited evidentiary value of gunshot residue, whether Trimpe would expect more than five particles of gunshot residue on defendant's clothing if defendant shot a gun, whether Trimpe would opine whether the five gunshot residue particles made it more likely than

---

[1] Defendant conceded that defense counsel's decision not to seek an adjournment of trial was sound strategy.

not that defendant shot a gun, and the possibility of cross-contamination by police officers. Based on these conversations, defense counsel chose not to present Trimpe as an expert at the *Daubert* hearing or at trial. Under these circumstances, defendant has failed to overcome the strong presumption the defense counsel's decision constituted sound trial strategy. *LeBlanc*, 465 Mich at 578. Defense counsel was not ineffective for failing to present an expert in gunshot residue at the *Daubert* hearing or at trial.

Defendant next argues that defense counsel was ineffective for failing to challenge the time that Locey entered Locey CPA on October 2, 2013. According to defendant, defense counsel should have questioned Donald Berry, an ADT service technician, about whether he checked the time on the alarm panel in Locey CPA with the time on his cellular telephone. Decisions regarding how to question witnesses are presumed to be matters of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Before trial, defense counsel decided to avoid "running times." Based on his own runs between the Snappy Mart and Locey CPA, defense counsel believed it was possible that Locey entered Locey CPA at 7:13 a.m. Defense counsel feared that if he challenged the time, Detective Sergeant Lonnie Palmer, the lead investigator, would "run that time," as well as "other times," and that could be worse for defendant. Defendant offers no reason why defense counsel's decision on this matter was not sound strategy. Accordingly, defendant has failed to overcome the presumption that defense counsel's performance in failing to challenge the time that Locey entered Locey CPA was sound trial strategy. *LeBlanc*, 465 Mich at 578. Defense counsel was not ineffective for challenging the time that Locey entered Locey CPA on October 2, 2013.

Defendant also claims that defense counsel was ineffective for failing to move to suppress evidence based on unreasonable searches and seizures. The Fourth Amendment of the United States Constitution, US Const, Am IV, guarantees every person's right to be free from unreasonable searches and seizures. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). Subject to several well-delineated exceptions, searches and seizures conducted without a warrant are unreasonable per se. *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999). The exclusionary rule prohibits the use of evidence obtained pursuant to an unreasonable search or seizure. *People v Goldston*, 470 Mich 523, 528; 682 NW2d 479 (2004). Defense counsel knew that defendant's car was seized without a warrant. He testified that he did not file a motion challenging the seizure because based on his review of the law and the facts, he concluded the motion would not be successful. Defense counsel also testified that for the evidence searched and seized pursuant to search warrants, he reviewed the supporting affidavits multiple times. He did not file any motions to suppress because, again, based on his interpretation of the law, he did not believe the motions would be successful. Where defense counsel chose not to file any motions to suppress because after reviewing the law and the facts he did not believe they could be supported, defense counsel's performance did not fall below objective standards of reasonableness. *Seals*, 285 Mich App at 17.[2]

---

[2] Regardless, the warrantless seizure of defendant's car was not unreasonable so long as the police had probable cause to believe that it contained evidence of a crime. See *Slaughter*, 489 Mich at 311; *People v Levine*, 461 Mich 172, 179; 600 NW2d 622 (1999) (a search of an

# VI. PROSECUTORIAL MISCONDUCT

Defendant argues that he was denied a fair trial when the prosecutor mischaracterized evidence and portrayed him as a bad man in closing arguments. Because defendant did not object to the alleged improper remarks by the prosecutor, he did not preserve the claims of prosecutorial misconduct. *Unger*, 278 Mich App at 235. We review unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Ackerman*, 257 Mich App at 448.

We review claims of prosecutorial misconduct on a case-by-case basis, examining the prosecutor's challenged remarks in context. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *Id*. A prosecutor is permitted to argue the evidence and all reasonable inferences arising from it. *Ackerman*, 257 Mich App at 453. But a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented. *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001).

---

automobile based on probable cause is a recognized exception to the warrant requirement). Because the record does not show that the police lacked probable cause before seizing defendant's car, defendant has not established the factual predicate of his claim that counsel made a serious mistake by failing to file a motion to suppress. *Hoag*, 460 Mich at 6. Defense counsel was not ineffective for failing to make a futile motion. *Ackerman*, 257 Mich App at 455.

Regarding the six affidavits that were submitted for search warrants, we note that evidence that was searched and seized pursuant to three of the search warrants, e.g., the search warrant for the Motorola cellular telephone, the search warrant for the Samsung cellular telephone, and the second search warrant for defendant's car, was not admitted at trial. Because no evidence that was searched or seized pursuant to these three warrants was introduced at trial, there is no reasonable probability that but for defense counsel's failing to file motions to suppress based on the warrants not being issued on probable cause, the result of defendant's trial would have been different. *Seals*, 285 Mich App at 17. Regarding the affidavit for a search warrant for defendant's person and all possessions on defendant's person, we conclude the facts and circumstances alleged in the averments would allow a reasonable person to believe that on October 2, 2013, evidence of Locey's murder was on defendant's person or on the possessions on defendant's person. *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). Regarding the first affidavit for a search warrant for defendant's car, as well as the affidavit for a search warrant for Cellco Partnership, doing business as Verizon Wireless, we note that even if the affidavits failed to establish probable cause, the good-faith exception to the exclusionary rule applied. See *United States v Leon*, 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1994). The affidavits were "not totally lacking in facts connecting" the places to be searched with Locey's murder, *United States v Carpenter*, 360 F3d 591, 596 (CA 6, 2004), such that the affidavits were so lacking in indicia of probable cause as to render any belief in its existence entirely unreasonable, *Leon*, 468 US at 923; *Goldston*, 470 Mich at 528. Accordingly, any motions to suppress would have been futile, and defense counsel was not ineffective for failing to assert futile positions. See *Unger*, 278 Mich App at 257; *Ackerman*, 257 Mich App at 455.

Defendant first argues that the prosecutor mischaracterized the evidence when he stated that James Brown, defendant's father, testified that defendant arrived at the house he shared with Teresa Brown, defendant's mother, at 7:26 a.m. on October 2, 2013. Because James testified that he started his pickup truck and pulled out of the driveway at 7:26 a.m. and that defendant had arrived five or six minutes earlier, the prosecutor clearly misrepresented the evidence when he stated that James testified that defendant arrived at 7:26 a.m. However, the prosecutor's mischaracterization of the evidence did not affect defendant's substantial rights. *Ackerman*, 257 Mich App at 448. Immediately before the prosecutor's improper remark, he told the jury that pursuant to the testimony of James and Teresa, as well as the testimony of David Munn and Thomas Carpenter, who were building a three-seasons room for defendant's parents, defendant arrived between 7:20 and 7:25 a.m. This remark corresponded to the evidence. Additionally, the jury was instructed that it had to decide the case based on the evidence, which included the testimony of the witnesses and the admitted exhibits, but it did not include the lawyers' arguments. A jury is presumed to follow its instructions, and instructions are presumed to cure most errors. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Defendant next argues that the prosecutor committed misconduct with his remarks regarding a pair of shoes that belonged to John Elkins that were not compared to the footwear impression found on the stapled papers near Locey's body. There was nothing improper about the prosecutor's remark. First, the prosecutor's statement that the footwear impression was not made by John's shoes was an argument based on the evidence. Palmer testified that John had an alibi for the morning of October 2, 2013, and the prosecutor argued that John's shoes did not make the footwear impression because the police confirmed that John did not commit the murder. Second, based on Palmer's testimony that another officer had spoken with "the expert" and the expert said that she could not test the shoe because due to the passage of time, the "wear pattern" on the shoes would be different, and there was evidence that Christine Gregory, an expert in footwear impression analysis, did not want to test the shoes because the tread pattern would have changed since October 2013. Because a prosecutor is permitted to argue the evidence and all reasonable inferences from it, there was no plain error. *Ackerman*, 257 Mich App at 448, 453.

Defendant also argues that the prosecutor mischaracterized Christine Gonzalez's testimony by stating that Gonzalez did not think that a speeding Jeep she saw on the morning of the murder was a big deal. Gonzalez testified that she did not think anything about the speeding Jeep until she heard "what was on the news." When asked if she then reported it because she thought it was important, Gonzalez answered, "That's not how it went. I had to be convinced to tell somebody. I didn't feel comfortable, 'cause I don't want to be a part of this. . . . And a coworker mentioned that I should say something in case it was relevant." Based on this testimony from Gonzalez, the prosecutor's statement that Gonzalez did not think that the speeding Jeep "had anything to do with anything" did not clearly and obviously mischaracterize Gonzalez's testimony. There was no plain error. *Ackerman*, 257 Mich App at 448.

Defendant further argues that the prosecutor committed misconduct because he portrayed defendant as a bad man when he emphasized the complaints about defendant's embezzling money shortly before Locey's death. At the beginning of his closing argument, the prosecutor told the jury that he would first give a chronological overview of the evidence, and in that overview, the prosecutor detailed what happened with VIP Auto Body. But unlike in

*Washington v Hofbauer*, 228 F3d 689, 699-700 (CA 6, 2000), the case relied upon by defendant, the prosecutor never argued that because defendant had embezzled money from VIP Auto Body, defendant had a propensity to commit wrongdoing and that the jury should consider defendant's character in rendering a verdict. The prosecutor did not make an "improper 'bad character' argument." *Id.* at 700. There was no plain error. *Ackerman*, 257 Mich App at 448.

In reaching our conclusions, we also find no merit to defendant's argument that defense counsel was ineffective for failing to object to the alleged improper prosecutorial remarks. Even assuming that defense counsel's performance in failing to object to the prosecutor's isolated mischaracterization of James's testimony fell below objective standards of reasonableness, we find there is no reasonable probability that but for defense counsel's deficient performance the result of defendant's trial would have been different. *Seals*, 285 Mich App at 17. Additionally, any objection to the other alleged improper remarks would have been futile because the prosecutor did not mischaracterize any other evidence or portray defendant as a bad man. Defense counsel was not ineffective for failing to assert futile objections. *Ackerman*, 257 Mich App at 455.

## VII. SUFFICIENCY OF THE EVIDENCE

Defendant argues that his convictions for second-degree murder and felony-firearm were not supported by sufficient evidence. Specifically, defendant argues that the evidence was insufficient for the jury to find that he was the person who shot and killed Locey. We review de novo a challenge to the sufficiency of the evidence and view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that the prosecution proved the elements of the crime beyond a reasonable doubt. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007).

Identity is an element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). The elements of an offense may be proved by circumstantial evidence and reasonable inferences from the evidence. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). The credibility of witnesses and the weight accorded to evidence are questions for the jury, and we will not interfere with the jury's determinations. *Id*.

On October 1, 2013, defendant met with Locey, in part, to discuss the alleged embezzlement from VIP Auto Body. According to Stevens, she voiced her opinion at the meeting that Locey should terminate defendant's employment. Although Locey had not yet made a final decision, he indicated that he was leaning towards agreeing with Stevens. The meeting upset Heather. She left the meeting before it was finished after calling defendant names. Also, to prevent the loss of any information relevant to the investigation of the embezzlement, Locey had Brunner take defendant's laptop computer to Ascend Computer on October 1, 2013 so that it could be backed up. The following morning, October, 2, 2013, according to the information retrieved from the ADT alarm panel, Locey entered Locey CPA at 7:13 a.m. Between 7:05 and 7:20 a.m., data communications from defendant's cellular telephone used sector two of tower 518, sector two of tower 901, and sector three of tower 905. According to Gonyeau, Locey CPA is in the area of coverage for each of these three sectors. The three sectors were also used for data communications from defendant's cellular telephone from 2:09 to 2:17

a.m. on October 1, 2013, from 1:01 to 2:01 p.m., on October 1, 2013, and from 8:00 to 9:10 a.m. on October 2, 2013, when it was known that defendant was at Locey CPA.

According to the witnesses, defendant arrived at James' and Teresa's house on October 2, 2013, between 7:15 a.m. and 7:30 a.m. Teresa testified that defendant used the bathroom to put in his contact lenses, wash his hands, and do his hair.

The clothing that defendant was wearing when he was arrested on October 2, 2013, was examined for gunshot residue, as were articles of clothing that were found on the passenger's seat of defendant's car and stubs dabbed on parts of the car. A gunshot residue particle was found on the pants that defendant had been wearing. Additionally, three gunshot residue particles were found on a jacket and one gunshot residue particle was found on a vest, both of which had been removed from the passenger's seat of defendant's vehicle. Murtha testified that there are only three ways in which an individual can have gunshot residue on him or her, one of which was that the individual discharged a gun. Additionally, numerous one-component and two-component particles were found on the articles of clothing and on the stubs dabbed on defendant's car. Murtha testified that one possible source for those particles was the discharge of a firearm.

Bullets were recovered from Locey's body. The bullets, which had been fired from the same gun, were from the ".38 class." William "Ed" Elkins, the shop manager for VIP Auto Body, had a .38-caliber Colt Army Special. On October 2, 2013, Ed discovered that the gun, which he had placed in a drawer in his desk in the break room at VIP Auto Body earlier that week, was missing. Although Ed did not believe that defendant had ever seen him place the gun in his desk in the break room, which he had just started using about three weeks before the murder, both Ed and Orville "Scott" Elkins testified that defendant had seen Ed place the gun in his desk in Scott's office on numerous occasions. Ed also testified that defendant knew that he had changed desks. Also, defendant had access to the break room, including on September 27, 2013, when defendant's activities at VIP Auto were not watched.

Viewing the above evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the prosecutor proved beyond a reasonable doubt that defendant was the person who shot and killed Locey. *Cline*, 276 Mich App at 642. We acknowledge that there is evidence from which one could argue that defendant was not the person who shot and killed Locey; however, it is for the jury to determine what inferences to draw from the evidence, *Dunigan*, 299 Mich App at 582. Here, when viewed in a light most favorable to the prosecution, we agree the evidence was sufficient to support defendant's convictions.

## VIII. CUMULATIVE ERROR

Finally, defendant argues that he is entitled to a new trial based on the cumulative effect of the errors. The cumulative effect of several errors may warrant reversal even where individual errors would not. *LeBlanc*, 465 Mich at 591. Only actual errors are aggregated to determine their cumulative effect. *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995). Here, only one error occurred—the prosecutor's mischaracterization of James's testimony regarding when defendant arrived at James and Teresa's house on October 2, 2013. Because

only one error occurred, there are no errors to aggregate to determine their cumulative effect. See *LeBlanc*, 465 Mich at 591 n 12.

We affirm.

/s/ Michael J. Riordan
/s/ Henry William Saad
/s/ Jane E. Markey